**UNITED STATES of America,
Plaintiff/Appellee,**

v.

**Dale Lynn RYAN, Defendant/Appellant.**

**No. 92–1357.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1992.

Decided Oct. 26, 1993.

Rehearing and Rehearing En Banc Granted;
Opinion and Judgment Vacated
Jan. 5, 1994.

Richard Lazarus, St. Louis, MO, argued (F. Thomas Schornhorst, on brief), for defendant/appellant.

Linda R. Reade, Asst. U.S. Atty., Des Moines, IA, argued, for plaintiff/appellee.

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN, Circuit Judge, and LARSON,* Senior District Judge.

LARSON, Senior District Judge.

Dale Lynn Ryan appeals from final judgment entered in the district court[1] upon a jury verdict finding him guilty of arson, in violation of 18 U.S.C. § 844(i). As a result of the arson, two volunteer firefighters died. Ryan was sentenced to 328 months of imprisonment. On appeal, Ryan asserts a *Brady* violation, denial of due process and his Sixth Amendment rights stemming from references to his retention of counsel, and four distinct errors in jury instructions. In addition, Ryan argues that the use of special verdict interrogatories was improper, that he was convicted of murder without a showing of culpability, that the sentencing guidelines were misapplied, and that the evidence was insufficient to support his arson conviction. We affirm the judgment of the district court.

## I.

On January 1, 1990, a fire destroyed the Ryan Fun and Fitness Center ("the Center") in West Burlington, Iowa. The Center, recently closed due to financial difficulties, was managed by appellant Dale Ryan, and owned by Ryan's father, a successful Kansas businessman. (Ryan's father had previously backed Ryan in two failed business ventures.) Ryan assumed management of the center in January of 1989 and immediately began a major remodeling effort. The ensuing year was fraught with difficulties, financial and familial, and Ryan soon lost his enthusiasm for the Center, while his relationship with his father became increasingly strained. Ryan stated on several occasions that he wished the Center would burn down. Ryan also expressed concern on several occasions that his father did not hold him in high regard because of his failures.

On December 6, 1989, Ryan's father directed that the Center be closed. Ryan had the locks changed, retaining the only two keys in his possession. (He did not replace the key in the exterior box, to be accessed by the fire department in an emergency.) Ryan then began efforts to sell the Center. On December 15, Ryan took a complete photographic record of the Center. On December 26, he removed his personal property, and some property belonging to the Center, ostensibly in an effort to ready the Center for sale. (Ryan later made a false claim for insurance coverage on the property belonging to the Center, claiming that it was lost in the fire.) On December 20, Ryan requested that U.S. West disconnect the Center's dedicated fire alarm line, as well as the regular phone line. Ryan believed that the lines would be disconnected immediately. In fact, the regular phone line was disconnected on December 21 and the dedicated line disconnected on December 28. Between December 20 and December 28, five trouble signals from the center (caused by interruption in the electrical current or the dedicated phone line) were received at the West Burlington law enforcement center. In each instance, the alarm was reset at the center's fire alarm panel, generally within a few minutes. On December 29, Ryan called U.S. West to verify the disconnection of the dedicated line.

---

* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

On December 29, at approximately 2:00 a.m., West Burlington police officer Larry Garmoe made a routine check of the Center. In the parking lot, he noticed a car loaded with containers, including floor solvents, motor oil, and linseed oil. Officer Garmoe could not identify the labels of several additional containers located in the back seat. Ryan received a ticket in November, 1989 while driving a car with the same license number. Officer Garmoe testified that he saw Ryan driving a car with the same license number on January 10, 1990. (While the license number was never in dispute, Officer Garmoe did note on the night of December 29, that the car which he observed was a blue Ford Fairmont. In fact, the car was a white Mercury Zephyr, owned by Ryan's father.)

On December 30 and 31, Ryan was distraught and depressed, apparently over a disagreement with his girlfriend. In late December, 1989, Ryan made serious inquiries about the purchase of a bar in Gulf Port, Illinois, indicating that money was no problem. On January 2, 1990, Ryan again spoke with the owner of the bar about the purchase, but failed to mention the fire at the Center.

The fire at the Center was discovered at approximately 8:30 p.m. on January 1, 1990. Firefighters later testified that, upon their arrival at the Center, all doors were locked and there were no signs of forcible entry. Firefighters further testified that they observed unusual fire behavior during the firefighting and rescue effort, similar, in their experience, to other fires which had been fueled by flammable liquids. Two distinct and separate red hot areas, approximately 50 feet apart, glowed on the roof; low bluish-colored flames which rekindled quickly when blackened with water danced on the floor; an intense wall of fire which did not respond to water swept across the lounge area; an isolated, interior fire confined to the sauna rekindled quickly when doused with substantial quantities of water; an unusual fire in the wall of the weight room also rekindled after being blackened with water. Firefighters Wilt and Klein were the first firefighters to enter the Center and were discovered missing ten to fifteen minutes later. Apparently having left their hoses in panic, in response to the wall of fire in the lounge, the bodies of the two men were discovered approximately three hours later in the DJ booth of the lounge area.

Ryan arrived at the fire scene shortly after the fire started. Firefighters later testified that Ryan, initially in a quiet mood, began making inquiries about the origin of the fire, and stated that he hoped they did not think it was arson. Ryan became very agitated when he learned that two firefighters were missing. Approximately four to five days later, Ryan wrote to his girlfriend, stating that he did not start any "fires" at the Center. On January 2, 1990, Ryan hired an attorney.

Investigations by the Iowa Fire Marshal's office and an electrical engineer ensued. It was revealed that Ryan had the only key at the time of the fire (the other having been lost in the snow), the circuit breaker for the fire alarm panel had been turned off, and the battery backup to the alarm had been disconnected before the fire. The fire marshal examined the debris and the number, location, and type of burn patterns, and concluded that the fire was caused by arson. The fire marshal also concluded that flammable liquids had been used and that there were at least six separate areas of fire origin. An electrical engineer also examined the fire scene and ruled out electrical cause and origin. Laboratory tests for flammable liquids, conducted on 26 samples taken from the fire scene, were negative. However, two experts testified that, depending upon the characteristics of the flammable liquids used, the amount of water applied, and the duration of the fire, flammable liquids can be diluted, can evaporate, or can be totally consumed by fire. Thus, the presence of flammable liquids is not always detectable, and the negative test results not always conclusive.

Ryan testified at trial, and called five expert witnesses in his behalf. Ryan's theory of defense was that arcing wires in a cash register, which he accidentally knocked off of the counter, caused the fire, which then spread to the other areas of the Center. Ryan contended that the multiple burn patterns were caused by pieces of flammable materials falling from the ceiling and that the fire spread through the roof. Ryan also offered evidence that the phenomena of flashover and backdraft caused the unusual fire behavior witnessed by the firefighters.

On rebuttal, the government's experts attacked Ryan's theory involving the design of the cash register. The experts also testified that Ryan's theory of the fire's spread was inconsistent with known fire behavior.

## II.

### A. *Due Process Violation*

Officer Larry Garmoe testified at trial about his observations in the early hours of December 29, 1989. Officer Garmoe noted the presence of a blue Ford Fairmont at the Center with numerous containers in the back seat. Officer Garmoe also testified that he saw Ryan driving the same car several days after the fire. At the time of his December 29 observations, the presence of the containers of linseed oil, floor solvents, and motor oil had no particular significance for Officer Garmoe, so his report simply notes the license plate number and make of the car. (The report was offered at trial as Exhibit AA.) Police records corroborate Officer Garmoe's testimony that he requested the dispatcher to run the license plate number with National Crime Information Center (NCIC) at the time of his report.

The West Burlington police chief testified that Ford and Mercury products are similar in appearance, and that colors are difficult to distinguish at night. There was no testimony that any of the products seen by Officer Garmoe in the car are flammable liquids or accelerants.

Exhibit AA was furnished to the defense during pretrial discovery. The content of Officer Garmoe's testimony was provided to the prosecutor only shortly before trial (approximately twenty months after the fire), and was not revealed to the defense.

Ryan moved for a mistrial, alleging a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court reserved its ruling, requesting additional information from the prosecution and advising the defense that it could proceed with cross-examination of Officer Garmoe, and that it could recall Officer Garmoe after all of the requested information had been provided. The defense vigorously cross-examined Officer Garmoe, emphasizing the incorrect description of the car, discrepancies in the time of his observations, the fact that Ryan was not the registered owner of the car, and that Garmoe had only recently come forward with this important information. After further hearing and review of documents on two occasions, the court denied Ryan's motion for mistrial, finding that the evidence was not exculpatory, that disclosure of the evidence during trial negated any claim of suppression, and that Ryan's due process rights were not violated.

■ Ryan contends that the prosecution's failure to provide the substance of Officer Garmoe's testimony, particularly the information regarding a blue Ford Fairmont, to the defense pretrial, requires reversal under *Brady v. Maryland, supra. Brady* requires disclosure of all material evidence favorable to the accused, whether impeachment or exculpatory evidence, in the possession of the United States. *Brady,* and its progeny, make clear that constitutional error is committed only where the omitted evidence would create a reasonable doubt about guilt that would not otherwise have existed. A finding of materiality of the evidence is required.

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *United States v. Wayne,* 903 F.2d 1188, 1192 (8th Cir.1990). Further, "the availability of other opportunities to elicit the same information on cross-examination is sufficient in determining whether a Defendant's constitutional rights have been violated." *United States v. Klauer,* 856 F.2d 1147, 1149 (8th Cir.1988) (discussing the confrontation clause).

■ Ryan's contentions fail under all elements of the *Brady* ruling. Ryan vigorously argues that the evidence was exculpatory and not incriminating, and that its "concealment" severely prejudiced his case. (Ryan's theory of defense included the argument that the

government could present no evidence whatsoever connecting Ryan to the use or possession of accelerants.) We disagree. The evidence was not exculpatory, but rather inculpatory, and the government was under no obligation to reveal it. *See United States v. Carper,* 942 F.2d 1298, 1300 n. 1 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 614, 116 L.Ed.2d 636 (1991). To the extent that the evidence included impeachment material, the evidence was revealed early in the trial, when sufficient time and opportunity remained to effectively use the damaging information in cross-examination. *United States v. Nelson,* 970 F.2d 439 (8th Cir.1992), citing *United States v. Klauer,* 856 F.2d 1147 (8th Cir. 1988). Any prejudice caused by the delay was sufficiently redressed and Ryan's due process rights were not violated.

We further agree with the district court's assessment as to materiality. Earlier disclosure of the evidence would not have affected the outcome of the trial; it was neither meaningful nor material evidence.

Ryan makes an additional allegation that Officer Garmoe's testimony was so inherently incredible as to constitute incriminating evidence that the government knew or should have known was false. This accusation of prosecutorial misconduct is fallacious and without substantiation. Officer Garmoe's testimony was certainly worthy of the vigorous cross-examination it received, particularly with regard to its timing. The determination of its credibility remains with the jury.

B. *Sixth Amendment Right to Counsel*

■ Ryan testified on direct examination that he retained a lawyer the day after the fire because he believed that he would be the focus of the arson investigation. Ryan argues on appeal that the prosecution's two subsequent references to that fact were calculated, repeated efforts to infer Ryan's guilt based upon his retention of an attorney, in contravention of the Sixth Amendment.

In the absence of a contemporaneous objection at trial, this court is limited to a determination of whether the prosecution's statements constituted plain error, affecting Ryan's substantive rights. Fed.R.Crim.Pro. 52(b). *United States v. Frady,* 456 U.S. 152, 162–3, 102 S.Ct. 1584, 1591–92, 71 L.Ed.2d 816 (1982); *United States v. Atkinson,* 297

U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). We have reviewed the record and we are not inclined to agree with Ryan's characterization of it. The prosecutor did not treat Ryan's exercise of his right to counsel as substantive evidence of Ryan's guilt. Rather, the prosecutor asked questions of Ryan in a fair response to Ryan's own testimony on direct. *See United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (discussing the right to remain silent). The prosecution's statements do not constitute plain error, and no miscarriage of justice has resulted. *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

C. *Jury Instructions*

1. *Jurisdictional Scope of 18 U.S.C. § 844(i)*

Title 18 U.S.C. § 844(i) provides:

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or *in any activity affecting interstate or foreign commerce* shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection shall be imprisoned for not more than twenty years or fined not more than $20,-000, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

(Emphasis supplied.) The district court instructed the jury as follows:

"Interstate commerce" means trade, or business, or travel between the states. "Used in an activity affecting interstate commerce" means to affect in some way trade, or business, or travel between the states.

If you find from the evidence beyond a reasonable doubt that, on or about January

1, 1990, the Ryan Fun and Fitness Center building was owned by Ronald D. Ryan, a resident of Kansas, and leased by him to Ryan Air Services, Inc., a Kansas Corporation, then the required affect on interstate commerce has been proved; or if you find from the evidence beyond a reasonable doubt that on January 1, 1990, the Ryan Fun and Fitness Center building was supplied with natural gas used to heat the building, and such natural gas was supplied from outside of the state of Iowa, then the required affect on interstate commerce has been proved. If you do not so find, then the required affect on interstate commerce has not been proved and you must find the defendant not guilty.

Jury Instruction Number 10. Ryan claims that the instruction failed to properly instruct the jury because neither of the two factual bases stated by the judge satisfies the statutorily required nexus between the Center and interstate commerce. More specifically, Ryan contends that the scope of the required "activity" is restricted to the commercial function served by the building at the time of the fire. Ryan's arguments are cleverly drawn and stated, and his position is certainly plausible, even inviting, on its face. However, this narrow approach to section 844(i) ignores legislative history as well as precedential case law in this circuit and learned comment from other circuits, and cannot carry the day.

 This court, along with others meeting the issue, has consistently construed the interstate commerce requirement of section 844(i) very broadly. Relying extensively upon the legislative history of section 844(i), the Supreme Court, in *United States v. Russell*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), concluded that Congress intended to exercise its full power under the Commerce Clause. In *United States v. Voss*, 787 F.2d 393, 397 (8th Cir.), *cert. denied*, 479 U.S.

888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986), we stated that Congress intended "to exercise its fullest, constitutionally permissible jurisdictional reach over persons attempting to commit arson to property affecting interstate commerce." A review of the legislative history makes it apparent that Congress intended to protect *at least* all business property. *United States v. Russell, supra; United States v. Mayberry*, 896 F.2d 1117 (8th Cir. 1990). In *United States v. Voss, supra*, we searched for a de minimis connection, holding that the de minimis standard is easily, though not always, met.[2] Subsequent to *Voss*, we have applied ever broadening definitions to the statutory language, "an activity used in interstate commerce". In *United States v. Mayberry*, 896 F.2d at 1120, we required "a showing that there is indeed some interstate character to the property involved." (Logging mill was temporarily closed, but still subject to lease, and still had electricity supplied to it.) And in *United States v. Hermes*, 847 F.2d 493, 496–97 (8th Cir.1988) (burned saloon, not in use, but held out by owner as available for commercial purposes), we stated that the reference in section 844(i) "has been held to require *merely that the property has some relationship to an activity of commercial nature.*" (Emphasis supplied.) (Citing *United States v. Andrini*, 685 F.2d 1094 (9th Cir.1982); *United States v. Patterson*, 792 F.2d 531 (5th Cir.), *cert. denied*, 479 U.S. 865, 107 S.Ct. 220, 93 L.Ed.2d 149 (1986).)

Under the preceding definitions, both of the bases used by the district court to establish the interstate commerce nexus are valid. Indeed, the receipt and use of natural gas from across state borders is an activity directly affecting interstate commerce. *See United States v. Mayberry*, 896 F.2d at 1119; *United States v. Barton*, 647 F.2d 224 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).[3] In this decision,

---

**2.** The showing in *Voss*, that a corporate property owner purchased insurance from an in-state carrier, doing business in more than one state, was held to be an inadequate nexus, as a matter of law.

**3.** While we declined to embrace this sweeping view in *United States v. Hansen*, 755 F.2d 629, 631, n. 4 (8th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985) (discussing the merits of basing jurisdiction on the use of

electricity; holding based upon interstate nature of transient tenants in building), the Supreme Court has made it clear that the determination that an activity affects interstate commerce need not depend upon any actual interstate movement. It suffices that the activity is "an element of a much broader commercial market". *Russell v. United States*, 471 U.S. at 862, 105 S.Ct. at 2457. *See also, United States v. Voss*, 787 F.2d at 398, n. 2; *United States v. Hermes*, 847 F.2d at 496, n. 2.

we join the Seventh Circuit in its holding in *United States v. Zabic,* 745 F.2d 464, 470–71, n. 4 (7th Cir.1984). However, we refuse to extend the decision, as did the Seventh Circuit, to property which is purely private in nature, such as a privately owned home, used solely for residential purposes. *United States v. Stillwell,* 900 F.2d 1104 (7th Cir. 1990).

Likewise, ownership of the Center by Ron Ryan, who leased the center to Ryan Air Services, a Kansas corporation solely owned by Ron Ryan, is an activity affecting interstate commerce. Ryan relies upon our decision in *Voss, supra,* and highlights the second circuit opinion in *United States v. Mennuti,* 639 F.2d 107 (2d Cir.1981), in his argument that passive ownership is insufficient. However, the relationship in this instance demonstrates anything but passive ownership. The evidence unequivocally showed that the ownership was interstate in nature, and that Ryan's father exercised direct, forceful control and decision making authority over the business and the disposition of the building itself. The important federal/state balance which the de minimis standard guards is maintained with this decision. *See United States v. Voss,* 787 F.2d at 397.[4]

### 2. *Sentencing Enhancement Provisions of 18 U.S.C. § 844(i)*

According to Ryan, 18 U.S.C. § 844(i) creates three distinct offenses, with graded punishments depending upon the seriousness of the resulting harm.[5] Using this argument as a springboard, Ryan spins off a variety of wrongs committed by the district court in submitting this case to the jury. The government takes the position that the penalties enunciated in section 844(i) comprise sentence enhancement provisions, rather than three separate statutory offenses. Under this interpretation, all of the essential elements of the crime were submitted to the jury, and Ryan was properly convicted.

■ The courts of appeals have not yet construed this aspect of section 844(i). However, consideration of the issue under other, somewhat similar statutes does lend some guidance. *See generally United States v. Rush,* 840 F.2d 574 (8th Cir.) *(en banc ), cert. denied,* 487 U.S. 1238, 108 S.Ct. 2908, 101 L.Ed.2d 940 (1988), and *United States v. Davis,* 801 F.2d 754 (5th Cir.1986) (both construing 18 U.S.C.App. § 1202(a), a portion of the Armed Career Criminal Act of 1984, and reaching differing conclusions). In determining statutory intent, we must first try to divine the intent of Congress from the plain language and structure of the statute. *Garrett v. United States,* 471 U.S. 773, 779–82, 105 S.Ct. 2407, 2412–13, 85 L.Ed.2d 764, *rehg. denied,* 473 U.S. 927, 106 S.Ct. 20, 87 L.Ed.2d 698 (1985) (considering the double jeopardy implications of a prosecution for engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848). Unfortunately, the plain language does not reveal the solution to our dilemma. In some respects, section 844(i) does resemble a sentence enhancement provision. The first portion of the lengthy sentence defines the crime of arson, while the second and third portions seem to do no more than single out a subset of arsonists for more severe punishment. In addition, the use of semicolons, the conjunctive "and", and the lack of clear division into separate sections suggests treatment of the contents as a single offense. *See United States v. Rush,* 840 F.2d at 577; *United States v. Hawkins,* 811 F.2d 210, 218–19 (3d Cir.1987). Most importantly, a discrete offense is not indicated. Section 844(i) clearly predicates punishment upon conviction of the underlying crime; the latter sections of the statute could not stand alone, independent of the arson offense. *See United States v.*

---

**4.** We are convinced that the record reflects additional, alternative acts upon which a showing that the Center was used in activity affecting interstate commerce could be grounded. Most notably, Ryan had, under explicit instructions from his father, begun the process of marketing the Center for resale. An appraisal had been conducted, and real estate agents communicated with, and the intent to sell the building was stated. The Center had been recently closed,

however, the building was obviously intended to be, and was, for all practical purposes, available for commercial use. *See United States v. Hermes,* 847 F.2d at 496, and cases cited therein. However, this additional undisputed evidence of alternative jurisdictional predicates cannot be considered upon review by the appellate court. *United States v. Voss,* 787 F.2d at 397–98.

**5.** See Section C, 1, above, for statutory language.

*Rush,* 840 F.2d at 577; *United States v. Davis,* 801 F.2d at 756.

■ On the other hand, section 844(i) is not free from ambiguity in that it lacks some of the common indicia of sentencing enhancement provisions. There is no *explicit* reference to conviction of the underlying offense, and while the penalty for resulting personal injury is a simple multiplier of the arson penalty ($10,000 to $20,000 and ten years to twenty years imprisonment), the penalty proscribed for resulting death is potentially infinitely more severe, and is left to the discretion of the jury (in the case of life imprisonment or death) or to the judge. Further, neither a procedure for sentence hearing, nor a title identifying the sentencing enhancement provisions appears in the statutory language. *See United States v. Davis,* 801 F.2d at 755–56.

While it is our conclusion that the above considerations militate in favor of interpreting section 844(i) as a sentencing enhancement provision, the plain language is not conclusive. For this reason, and because the import of any statute allowing the death penalty must be cautiously divined, we turn for guidance to the legislative history of section 844(i). We have extensively reviewed the Congressional Record regarding the provisions of the Organized Crime Control Act of 1970 (now referred to as the Comprehensive Crime Control Act), and its 1982 and 1984 amendments. Developed at a time of great civil unrest [6], this federal legislation was originally designed to govern only "explosive(s)" (Pub.L. 91–452). In 1982 the word "fire" was added (Pub.L. 97–298) to ensure that the section could be used in all federal arson cases, especially those arsons caused by gasoline. *See* 1982 U.S.Code Cong. & Admin.News, p. 2631. The 1970 legislation was seen by Congress as a "tough" measure, "needed ... to deal effectively with the conspiratorial groups who are so insane as to use explosives and incendiary devices." 116 Cong.Rec. 35298 (1970). The language now in question was part of the original legislation and, indeed, remains virtually unchanged since its passage in 1970.[7] The 1970 Congressional Record indicates that section 844 had, at its inception, two distinct facets. The first portion was to provide a regulatory framework for manufacturers, dealers, and users of explosives. The second facet made "bombings" a federal offense subject to stringent sanctions, including the death penalty. The Congressional Record reveals that the latter portion of section 844 was consistently referred to as a "proposal to punish," and is discussed solely in terms of "strict and substantial penalties" and "sanctions" to be imposed. 116 Cong.Rec. 35299 (1970).

· The 1984 legislative history evidences the same concern with sentencing enhancement. Senate Report No. 98–225 at 4, U.S.Code Cong. & Admin.News 1984, p. 3182, sets out the text of the report of the Senate Committee on the Judiciary. Senator Thurmond's report, recommending proposed comprehensive reforms and improvements in the federal criminal laws, is most enlightening. The report on the section now codified as 18 U.S.C. § 844(i), refers throughout to "enhanced penalty provisions" and "enhanced punishments."

> All of these subsections contain enhanced penalty provisions that apply if personal injury or death results that represent a substantial increase over the ten years of imprisonment and $10,000 fine authorized as the maximum punishment for their violation if no injury or death results. On their face, these enhanced penalty provisions would appear to apply to the death or injury of a fireman or police officer who responded to an arson or other offense committed in violation of subsection (d), (f), or (i). However, a Federal district court has recently held that the enhanced penalty provisions did not apply to injuries to or deaths of firefighters that occurred while fighting an arson fire set in violation of subsection 844(i).

---

**6.** Bombings during a sixteen month period in 1969–1970 numbered in excess of 4,500, and included numerous federal buildings, with federal officers and employees as the targets. 116 Cong.Rec. 35298 (1970).

**7.** In 1984, Pub.L. 98–473 substituted more specific, explanatory language for the phrases "personal injury results" and "death results" in response to a federal district court decision holding that the provisions did not apply to firefighters. *See* 1984 U.S.Code Cong. & Admin.News, p. 3507.

Part N is designed to clarify congressional intent in this regard to ensure that the enhanced punishment provisions of subsections (d), (f), and (i) apply if personal injury or death results to any person including a fireman, policeman or other public safety officer, because of a violation.

. . . .

As discussed, the purpose of these amendments is to make clear the congressional intent that any person who violates one of the subsections in a manner that results in a public safety officer's injury or death is subject to the enhanced punishments provided in the subsections.

1984 U.S.Code Cong. & Admin.News, pp. 3507–08 (footnotes omitted). This language is free from ambiguity. Our examination of the origins of the law and the intentions of its drafters leads inescapably to the conclusion that Congress's concern was with the stringent and severe treatment of those who violate the explosives/arson law. Congress meant to deal with arsonists severely, not to overlay a myriad of elements of proof onto the plain statutory requirements, as Ryan suggests. We hold that 18 U.S.C. § 844(i) is a sentencing enhancement provision, not a separate and distinct offense with distinct, heightened elements of proof.

### 3. *Foreseeability and Public Safety Officers*

The remainder of Ryan's claims of error in the jury instructions are largely resolved by the finding above, that the latter portions of section 844(i) are sentencing enhancement provisions. The findings necessary to impose the enhanced penalty were within the province of the judge, not the jury. Suffice it to say that, contrary to Ryan's protestations, he was not convicted absent jury findings on all critical elements of the crime. The jury, via special verdict interrogatories, made extensive findings. We do however, comment briefly upon several of Ryan's arguments in the interest of resolving any recurring questions.

■ First, Ryan argues that the statutory language, "as a direct or proximate result of conduct prohibited by this subsection . . ." engrafts upon the statute the common law standard of negligence. In other words, Ryan would require a specific finding that the deaths of the two firefighters were foreseeable to Ryan when he set the fire. Further, Ryan alleges that, in this case, only cause in fact was considered in the determination of the relationship between his conduct and the two deaths. We hold that the use of the term "proximate cause" in this criminal statute does not require a distinct finding of foreseeability.

To be sure, the report of the Senate Committee on the Judiciary addresses proximate cause and sets forth an array of examples where the consequences of an act of arson are "reasonably foreseeable," including, "a response by firemen and others." U.S.Code Cong. & Admin.News 1984, p. 3508. This comment, however, does not so dramatically alter the elements of the crime as Ryan suggests. Proximate cause is commonly defined as:

> That which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred. . . . An injury or damage is proximately cause by an act, or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

*Black's Law Dictionary* (6th ed. 1990). The court in this instance submitted the following instruction to the jury:

> The deaths of William Klein and Joseph Wilt resulted from defendant's conduct of setting the fire if his conduct was a proximate cause of their deaths. Defendant's conduct was a "proximate cause" of their deaths if it was a substantial factor in causing them to die on January 1, 1990, and they would not have died then except for defendant's conduct.
>
> "Substantial" means that defendant's conduct has such an effect in producing the deaths as to lead a reasonable person to regard his conduct as a cause of the deaths.
>
> An event, such as the deaths of William Klein and Joseph Wilt, may have more than one proximate cause. The govern-

ment need not prove that defendant's conduct was the only proximate cause of their deaths; it needs to prove only that defendant's conduct was a proximate cause of their deaths.

Jury Instruction Number 13.

We find the legal principle of proximate cause embodied in section 844(i) to have been adequately presented to the jury. When Congress provided that death proximately resulting from arson could be punishable by death or life imprisonment, we must consider it to have been fully cognizable of the principles of legal causation. *Cf. United States v. Guillette,* 547 F.2d 743 (2d Cir.1976). There is no intent by Congress on the face of the statute to engraft the elements of common law negligence onto the arson statute, thus frustrating the purpose of the statute with artificial restrictions.

Ryan *admits* that one could conclude from the evidence that his conduct proximately caused the deceased men to engage in their duties as firefighters, but argues that the deaths were not reasonably foreseeable because the men left their water hoses while inside the building.[8] (The government's evidence suggests that an intense wall of fire which did not respond to water, sweeping across the interior of the building where the men were located, caused the men to panic.) Ryan's suggestion is patently absurd and even insulting. The variation in this instance in the result intended by Ryan, and the result actually achieved by Ryan, in setting the fire is not so tenuous that is would be unfair to hold him criminally responsible for the actual result—death.

■ Second, Ryan quibbles with the court's use of the words "voluntary firefighters" instead of the statutory language, "public safety officers". A legal question for the judge, we find no error in the court's decision that the statutory term includes voluntary firefighters. The legislative history supports this conclusion. It is clear that the 1984 amendments were intended to apply to firefighters. U.S.Code Cong. & Admin.News 1984, pp. 3507–8. In addition, "public safety officers" is defined at 42 U.S.C. § 3796b(7) to include firefighters, with or without compensation. Furthermore, section 844 refers to the death of "*any* person, including public safety officers" (emphasis supplied). For purposes of conviction, Ryan's argument is of no import whatsoever.

### 4. *Use of Special Interrogatories*

■ The district court, faced with the parties' arguments regarding the issue of statutory construction, did not make a specific finding on the issue. Rather, the court wisely and skillfully structured the jury instructions, verdict form, and special interrogatories [9] in such a fashion that, regardless of our ultimate holding on the issue, we would have the benefit of all of the jury's findings. The jury considered and made findings as to each and every element of section 844(i), using the standard "beyond a reasonable doubt."

Ryan's assertion that the use of special interrogatories is generally forbidden, and that these particular interrogatories crafted by the district court avoided a verdict by the jury on the issue of homicide, is completely misplaced. The courts have indeed been critical of special interrogatories in criminal cases. *United States v. Desmond,* 670 F.2d 414 (3d Cir.1982); *United States v. Spock,* 416 F.2d 165 (1st Cir.1969); *Gray v. United States,* 174 F.2d 919 (8th Cir.), *cert. denied,* 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949). The overriding concern, eloquently addressed in several of these cases, is one of judicial control.

> There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step. A juror, wishing to acquit, may be formally catechized. By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted. The result may be accomplished by a majority of the jury, but the course has been initiated by the judge, and directed by him through the frame of the questions.

*United States v. Spock,* 416 F.2d at 182. However, special interrogatories may be appropriately and effectively used in particular

---

8. Appellant's brief at 32.

9. See Appendix A for verdict form and special interrogatories.

situations without abridging the concerns expressed over their use generally. *See, e.g., United States v. Owens,* 904 F.2d 411 (8th Cir.1990); *United States v. Aguilar,* 883 F.2d 662 (9th Cir.1989), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991).[10]

Here, the questions posed by the judge in the interest of clarity, completeness, and avoidance of the retrial of a lengthy case, evidence no elements of control or restriction by the court. The judge did not infringe upon the jury's power to freely deliberate, did not require the jury to justify its actions, and did not ask "why" the jury arrived at its decision. Nor did the court challenge the jury's power to ignore the court's instructions if it so desired, require the jury to set aside its most valuable asset as fact finder (collective common sense), or direct the jury, intentionally or unintentionally, to follow a course initiated by the court. We recognize that the use of special verdict forms, closely crafted and carefully scrutinized, may be appropriate for some limited purposes. This case, in which the criminal statute was as yet undefined, is just such an instance.

The remainder of Ryan's argument on this subject elevates form over substance. The fact that the jury did not make its finding on a form entitled "General Verdict" makes the findings no less clear. The jury inescapably found beyond a reasonable doubt that Ryan maliciously destroyed a building by fire, and that the deaths of the two voluntary firefighters resulted. The form of the verdict and the jury instructions, taken as a whole, were more than adequate and do not abridge Ryan's rights to a fair trial or to due process.

### D. *Federal Arson Statute*

Throughout Ryan's arguments and dressed in several different guises is the assertion that Ryan was unjustly convicted of murder. Contrary to Ryan's arguments, 18 U.S.C. § 844(i) is not the functional equivalent of murder in the first degree. The court and the jury made the exact determinations required by the statute, no more and no less. Section 844(i) is an arson statute, with severe

repercussions for the arsonist whose actions result in the death of another individual. Congress intended that such reckless behavior result in harsh punishment. Congress's intentions may not be subjugated to the finesse of legal arguments, attempting to overlay the requirements of murder on the federal arson statute.

### E. *Sentencing*

#### 1. *Application of the Most Analogous Guideline*

■ The court's starting point in computing Ryan's sentence under the United States Sentencing Commission, *Guidelines Manual* (U.S.S.G.) was § 2K1.4(c)(1), which states:

> If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above.

Finding that Ryan's conduct was reckless and wanton, and grossly deviated from a reasonable standard of care, the court then determined that the most analogous guideline is U.S.S.G. § 2A1.1, First Degree Murder, with a base offense level of 43. However, in a further finding that Ryan did not cause the two deaths intentionally or knowingly, the court departed downward to a base offense level of 38. (The base offense level for second degree murder is 33. The court chose an offense level at the mid-point between the two murder offenses.) Adding a two point enhancement for the obstruction of justice, the court assigned Ryan a base offense level of 40, and sentenced him to 328 months of imprisonment. (The sentencing range at this offense level is 292 months to 365 months.)

The district court's findings and conclusions are fully supported by the facts and the law. Recognizing that "the crux of the issue is really whether there was malice aforethought," S.Tr. 38, the court articulated thoughtful and complete findings supporting its decision.[11]

---

10. *See also Kawakita v. United States,* 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952); *United States v. Smith,* 938 F.2d 69 (7th Cir.), *cert. denied,* ⸻ U.S. ⸻, 112 S.Ct. 254, 116 L.Ed.2d 208 (1991); *United States v. Pforzheimer,* 826 F.2d 200 (2d Cir.1983).

11. In the Eighth Circuit, malice aforethought may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, or of such a nature that the fact finder is warranted in inferring that the defendant was aware of a serious

And I might point out, we are not dealing with a building that was set afire willfully that was located out in the middle of a remote rural area with no people living around it. Certainly somebody torching such a building in such a location is confronted with a different situation. He has every reason to believe that probably the building would be burned to ashes before anybody would even know it.

Here we are dealing with a fairly large commercial structure located in an urban area, in an urban area where it was obviously going to be discovered quickly by somebody driving by, as it was, long before it was totally destroyed, and that a fire department would be responding to the fire. We are also dealing with a situation, as Miss Reade described, where the fire was well-fueled and started, according to the testimony of Government witnesses who persuaded the jurors, in different places in the building.

Under all of the facts in evidence, I do find by a preponderance of the evidence and conclude that the conduct of the defendant was reckless and wanton; it was conduct that grossly deviated from a reasonable standard of care, and it certainly was of such a nature as to warrant the inference that I make that the defendant was aware of serious risk of death or serious bodily harm resulting. And according to that, I conclude that the most analogous offense under chapter 2, part A is first-degree murder with a base offense level of 43.

S.Tr. 40–41.

The act of arson is, by its very nature, an act of violence, an inherently dangerous act which involves the real risk of injury or death. It does not require any stretch of the imagination to recognize that, in the course of fighting a fire, death may result. Congress recognized arson as an inherently dangerous and shocking felony when it included it as a felony murder in the definition of first degree murder. 18 U.S.C. § 1111(a). Likewise, the Sentencing Commission recognized the need for appropriately severe sanctions by directing the court to determine the most analogous crime, and by instructing that

guideline § 2A1.1 "also applies when death results from the commission of certain felonies." U.S.S.G. § 2A1.1, comment. (n. 1).

In departing downward from level 43 to level 38, the district court again followed the guidance of the Sentencing Commission. Finding that Ryan did not cause the deaths intentionally or knowingly, the court considered Ryan's state of mind, the degree of risk inherent in the conduct, and the nature of the underlying offense conduct in making its determination. U.S.S.G. § 2A1.1, comment. (n. 1).[12]

Yet again Ryan argues that the court convicted him of criminal homicide without proving the elements of criminal homicide. However, what Ryan refers to as a "shocking misapplication" of the sentencing guidelines, is simply the court's straightforward and correct application of the law as it is set forth. While Ryan argues that there is no homicide offense analogous to Ryan's offense and thus, no higher offense level whatsoever may be assigned, we agree with the determination of the district court that the offenses of first and second degree murder are comparable, though certainly not identical. The judge carefully and conservatively chose an offense level at midpoint between the two, recognizing that "malice aforethought" is an element of both of the offenses. What statement could the judge have made which would have more clearly supported his actions? Ryan's protestations to the contrary, the facts do support the judge's findings.

### 2. Obstruction of Justice

■ Ryan also challenges his two level sentencing enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Ryan argues that the court must make particularized findings that he perjured himself in testifying that he was innocent. In addition, Ryan urges that the inquiry is unconstitutional in that it places an intolerable burden on his right to testify.

This court has held that, while the enhancement may not be based solely upon Ryan's failure to convince the jury of his innocence, it may be "based on the experi-

---

risk of death or serious bodily harm. *United States v. Johnson*, 879 F.2d 331, 334 (8th Cir. 1989); *United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir.1978).

**12.** Note that the Commission does not envision any departure *below* that specified for second degree murder. U.S.S.G. § 2A1.1, comment. (n. 1).

enced trial judge's express finding, based on the judge's personal observations, that [the defendant] lied to the jury." *United States v. Ogbeifun,* 949 F.2d 1013, 1014 (8th Cir. 1991). Thus, the analysis does not call for the specific findings and particular intonations urged by Ryan, but does call for an independent evaluation and determination by the court that Ryan's testimony was false. *See United States v. Willis,* 940 F.2d 1136 (8th Cir.1991).

In this instance, the government urged the enhancement based upon two excerpts of trial testimony wherein Ryan denied setting fires and denied using accelerants at the center. The court noted that perjury is specifically contemplated as an obstruction of justice under the sentencing guidelines,[13] and further stated:

> In this case, the jury did find the defendant willfully started the fire. The defendant very clearly denied that he started the fire. I have no quarrel with the jury verdict. .... Under the totality of the facts and the testimony here, I find that the defendant, in fact, did commit perjury during the trial, and he will be subjected to a two-point increase in the offense level under guideline 3C1.1.

S.Tr. 21–22.

The question of Ryan's perjury lies within the sound discretion of the district court. We give due regard to that court's observations and judgments of credibility in determining whether Ryan perjured himself at trial. *United States v. Benson,* 961 F.2d 707 (8th Cir.1992). There is no question that the enhancement in this case was based upon the court's independent and express finding that Ryan lied to the jury.

The constitutional issues raised by Ryan have been previously addressed by this court. *United States v. Ogbeifun,* 949 F.2d 1013 (8th Cir.1991). Ryan's arguments add no new dimension to the issue and need not be considered further.

F. *Insufficiency of the Evidence*

▇ Ryan's final argument is that the evidence presented by the government was insufficient to establish his guilt. In considering Ryan's motion for judgment of acquittal, the court viewed the evidence in the light most favorable to the government and upheld the conviction. We have frequently reiterated the standard by which the evidence is to be judged. To wit, the conviction should be upheld if a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Haren,* 952 F.2d 190, 194 (8th Cir.1991) ("(where) there is substantial evidence justifying an inference of guilt as found irrespective of any countervailing testimony that may be introduced." *United States v. Rodriguez,* 812 F.2d 414, 416 (8th Cir.1987)).

We are in agreement with the district court. The substantial, albeit largely circumstantial, evidence in this case is not in any instance insufficient. We refuse to invade the province of the jury and of the court in their well-considered and supported decisions.

### III.

For the reasons stated above, the judgment of the district court is affirmed.

RICHARD S. ARNOLD, Chief Judge, concurring in part and dissenting in part.

I concur in Parts II.A, B, C.3, C.4, D, and E of the Court's opinion. I also concur in the result reached in part C.2, but dissent with respect to its holding that the increased sentencing provisions of 18 U.S.C. § 844(i) define a sentencing factor and not an element of the offense. I respectfully dissent from the Court's holding in part C.1 that the interstate-commerce requirement of § 844(i) is satisfied by the mere showing that the building either was supplied with natural gas or was owned by an out-of-state resident. The statute's language, Supreme Court precedent, and precedent of this Court make clear that the structure in question must either be used in interstate commerce or in an activity affecting interstate commerce. Since there was no showing that the defunct Ryan Fun and Fitness Center was engaged in an activity affecting interstate commerce at the time it was burned, I dissent.

---

**13.** U.S.S.G. § 3C1.1, comment. (3(b)).

## I.

Today the Court concludes that the portion of 18 U.S.C. § 844(i) that begins, "and if death results to any person ...," is a sentencing factor and not an element of the offense. I cannot agree with this conclusion.

The first step in determining the import of a statute is to look at the language of the statute itself. *United States v. Rush,* 840 F.2d 574 (8th Cir.) (en banc), *cert. denied,* 487 U.S. 1238, 108 S.Ct. 2908, 101 L.Ed.2d 940 (1988). The statute reads in pertinent part as follows:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both ...; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any terms of years, or to the death penalty or to life imprisonment....

As the Court has recognized, Section 844(i) is far from clear. It lacks the traditional indicia of a sentence enhancement; as the Court notes, the increase in punishment upon a finding that a death has occurred is infinitely more severe, and that increase is not a multiple or a derivative of the original sentence (either of which might indicate Congress intended a sentence enhancement). The Court nonetheless concludes, in the face of the ambiguity in the statute, that its language "militates" in favor of interpreting the "if death results" provision to be a sentencing factor. This conclusion is inconsistent with the settled rule that ambiguities in criminal statutes are to be resolved in favor of the defendant, under the Rule of Lenity. *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

The Court attempts to support its conclusion that the "if death results" provision is a sentencing factor by pointing to legislative history. This reliance is misplaced. The Court refers to the remarks of a single Congressman, Representative Schadeberg of Wisconsin, as showing that Section 844(i) was "consistently" referred to as a "proposal to punish." In context, the Congressman, who was neither the committee chairman nor the ranking minority member, was merely attempting to convince his colleagues that Section 844(a)–(i) was an important part of the Organized Crime Act as a whole. All discussion of penalty found in the legislative record was designed only to convince fellow members that federalization of certain classes of bombings was necessary to bring the perpetrators to justice. 116 Cong.Rec. 35298–99 (1970). The Court's reference to Senator Thurmond's 1984 Report for the Senate Judiciary Committee is similarly unavailing. Once again, the Court has chosen a single sentence out of context to demonstrate that the "if death results" provision is a punishment provision; the Senate Report was discussing punishment in the context of including firefighters and police within the definition of "any person." In neither case does the legislative history address whether the "if death results" language was intended to be an element of the offense or just a sentencing factor. Finally, the legislative history is not as clear as the Court suggests. The House Judiciary Committee Report on the proposal that became the Organized Crime Act states in its reference to Section 844(i): "Existing penalties are increased and the death penalty is extended to *new offenses* added by the title." H.R.Rep. No. 91–1549, 91st Cong., 2d. Sess. 5 (1970), 1970 U.S.Code Cong. & Admin.News 4011 (emphasis added).

Ultimately, the legislative history is far from clear, and, as Chief Justice Rehnquist stated in *Regan v. Wald,* 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), the statements of individual Congressmen, "unless very precisely directed to the intended meaning of particular words in a statute," cannot take precedence over the statute's own language. *Id.,* at 237, 104 S.Ct. at 3055.

Since Section 844(i) is ambiguous as to whether the "if death results" provision is a sentencing factor or an element of the offense, and since the legislative history does not directly speak to and clarify this question, the Rule of Lenity requires this Court to interpret the statute in favor of the defendant. Therefore, the "if death results provi-

sion" defines an element of the offense. I nonetheless concur in the Court's rejection of defendant's arguments based on the failure to charge the jury that it must find that death resulted as an element of the offense, because any error on that count was cured by the District Court's submission of the question to the jury on special interrogatories. The jury found beyond a reasonable doubt that the deaths of Firefighters Wilt and Klein resulted as a consequence of the arson; therefore, the jury in fact passed on all the elements of the crime.

## II.

The Court today holds that the mere receipt of natural gas or out-of-state ownership of property is an activity sufficient upon which to base jurisdiction under 18 U.S.C. § 844(i). The Court grounds its holding on language from *Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), and *United States v. Voss,* 787 F.2d 393 (8th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986). The Court correctly states that these cases stand for the proposition that Section 844(i) is to be read broadly, and that Congress intended to exercise its full Commerce Clause power to protect commercial property. *Russell,* 471 U.S. at 860, 105 S.Ct. at 2456; *Voss,* 393 F.2d at 397. However, the Court bends this precedent out of shape to conclude that mere receipt of natural gas or out-of-state ownership, without any additional showing as to the use of the structure itself, satisfies the activity requirement of Section 844(i).

In *Russell,* the Supreme Court did say that the legislative history of Section 844(i) "suggests" that Congress intended to protect at least all business property, as this Court states; nonetheless, the Supreme Court also pointed out that "[b]y its terms, however, the statute *only applies* to property that is *'used' in an 'activity' that affects interstate commerce."* *Russell,* 471 U.S. at 862, 105 S.Ct. at 2457 (emphasis added); see also *Voss,* 787 F.2d at 397 (the use of the building itself must have a *de minimis* connection to inter-

state commerce). In other words, there must be a showing that there is "some interstate character to the property involved." *United States v. Mayberry,* 896 F.2d 1117 (8th Cir.1990).

Ryan Fun and Fitness Center was no longer a going concern at the time it was burned. Had the business been in operation, then its use of natural gas or the fact of out-of-state ownership might be relevant to the inquiry of whether its use affected interstate commerce. Nonetheless, an inquiry into its use would still be necessary for Section 844(i) to apply. The Court relies on several cases involving businesses that had either been temporarily closed or were no longer in use to justify its holding; however, in each of these cases the business was still operational. *United States v. Mayberry,* 896 F.2d at 1120 (logging mill temporarily closed due to lumber shortage but ready to operate once lumber was received); *United States v. Hansen,* 755 F.2d 629 (8th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985) (apartment building held to be used in interstate commerce);[1] *United States v. Hermes,* 847 F.2d 493 (8th Cir.1988), (saloon was no longer in use but was held out by its owner as available for lease for commercial purposes).[2] When the Ryan Fun and Fitness Center closed, it closed permanently and was no longer available for commercial use. Ryan had not placed the building up for sale, nor was he attempting to lease it to anyone out of state. Therefore, the building's receipt of natural gas, without more, is insufficient to establish the necessary use in an activity that affects interstate commerce. Similarly, out-of-state ownership alone does not establish that the building's use at the time it was burned had an effect on interstate commerce. The proper inquiry is into the function of the building itself, and then a determination of whether that function affects interstate commerce.

Further, the Court's holding disturbs the balance between the state and federal governments by allowing federal prosecutors to bring almost any arson prosecution—tradi-

---

1. In *Russell,* the Supreme Court stated that the rental of an apartment building satisfied the requirement of Section 844(i) that the building be used in an activity affecting interstate commerce. 471 U.S. at 862, 105 S.Ct. at 2457.

2. The Court's reliance on the Seventh Circuit decision in *United States v. Zabic,* 745 F.2d 464 (1984), is also misplaced. That case, decided

before *Russell,* held that the receipt of natural gas by a 43–unit apartment building "used exclusively for commercial purposes" provided the necessary effect on interstate commerce. But once again, the primary inquiry into the building's *use* had already been made, and it was determined that the building was currently in use as a commercial enterprise. It was that use that

tionally a state crime—without a clear expression of Congress's intent to do so. Arson is a traditional common-law state crime; therefore, any federalization of arson laws must be clearly stated. *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1981) ("unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" in the prosecution of crimes). Taken to its logical conclusion, the Court's holding would allow the federal courts to reach almost all arson cases, regardless of whether the structure in question was business or residential. The Court's refusal to acknowledge this fact demonstrates the fundamental flaw in its reasoning. Without an inquiry into the use of the structure, arson committed against any building, even a private home, would be a federal crime, as the Seventh Circuit recognized in *United States v. Stillwell,* 900 F.2d 1104 (7th Cir.), *cert. denied,* 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). Congress may have the power under the Commerce Clause to reach arson committed against a private home; however, it has not chosen to exercise that power.[3] I therefore respectfully dissent, and would remand this case for a new trial with proper instructions on the issue of interstate commerce.

## APPENDIX

### COUNT 1

*Form No. 1*

We, the jury, find the defendant, Dale Lynn Ryan, guilty of malicious destruction of a building by fire as charged in Count 1 of the indictment.

 (s) <u>Thomas R. Johnston</u>
 FOREPERSON

*Form No. 2*

We, the jury, find the defendant, Dale Lynn Ryan, not guilty of malicious destruction of a building by fire as charged in Count 1 of the indictment.

_____

FOREPERSON

QUESTIONS

(To be answered only if you have found the defendant guilty.)

(1) Do you find that the government has proved beyond a reasonable doubt that defendant's conduct of setting the fire resulted in the death of William Klein?

Yes <u>X</u> No _____

(2) Do you find that the government has proved beyond a reasonable doubt that defendant's conduct of setting the fire resulted in the death of Joseph Wilt?

Yes <u>X</u> No _____

(3) Do you find that the government has proved beyond a reasonable doubt that at the time of his death, William Klein was a volunteer firefighter in the West Burlington Volunteer Fire Department?

Yes <u>X</u> No _____

(4) Do you find that the government has proved beyond a reasonable doubt that at the time of his death, William Klein was performing his duties as a volunteer firefighter as a direct or proximate result of defendant's conduct of setting the fire?

Yes <u>X</u> No _____

(5) Do you find that the government has proved beyond a reasonable doubt that at the time of his death, Joseph Wilt was a volunteer firefighter in the West Burlington Volunteer Fire Department?

Yes <u>X</u> No _____

(6) Do you find that the government has proved beyond a reasonable doubt that at the time of his death, Joseph Wilt was performing his duties as a volunteer firefighter as a direct or proximate result of defendant's conduct of setting the fire?

Yes <u>X</u> No _____

 (s) <u>Thomas R. Johnston</u>
 FOREPERSON

then affected interstate commerce. This Court today omits the necessary initial inquiry into whether the building was used in a way that affects interstate commerce.

**3.** This conclusion is in accord with other circuits that have addressed the issue. See *United States v. Mennuti,* 639 F.2d 107 (2d Cir.1981) (because Congress did not exercise its commerce power to include private residences, it is limited by the language of Section 844(i)); *United States v. Monholand,* 607 F.2d 1311, 1316 (10th Cir.1979) (there is *no indication in the statute* that Congress, although it intended to have the statute broadly construed, intended everybody and everything to be included).