UNITED STATES of America, Plaintiff,

v.

**Dale Lynn RYAN, Defendant.**

**No. CR. NO. 97–71.**

United States District Court,
S.D. Iowa.

Oct. 23, 1998.

Robert C. Dopf, Assistant U.S. Attorney, Des Moines, IA, for Plaintiff.

Lawrence S. Robbins, Gary A. Orseck, Mayer, Brown & Platt, Washington, DC, William W. Graham, Thomas D. Hanson, Lu Ann White, Des Moines, IA, for Defendant.

### MEMORANDUM OPINION AND RULING DENYING § 2255 MOTION

VIETOR, Senior District Judge.

Dale Lynn Ryan was convicted of arson in violation of 18 U.S.C. § 844(i). Before the court for ruling is defendant Ryan's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. An evidentiary hearing was held on the motion and the court has received the benefit of thorough written briefs and oral arguments of counsel for the parties. There are four issues:

(1) Was defendant denied effective assistance of counsel because of an actual conflict

of interest that adversely affected his lawyer's performance?

(2) Was defendant denied effective assistance of counsel by reason of his lawyer's failure to object to the court's instruction concerning the interstate commerce element of the crime?

(3) Was defendant denied effective assistance of counsel because of his lawyer's failure to properly investigate?

(4) Was defendant's conviction obtained pursuant to an unconstitutional application of the criminal statute based on the post-trial decision of the United States Supreme Court in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

This court concludes that defendant has failed to establish entitlement to relief under section 2255 on any of the four grounds.

## HISTORY OF THE CASE

On January 1, 1990, a fire destroyed the Ryan Fun & Fitness Center (the fitness center) in West Burlington, Iowa. Two firefighters died fighting the fire. On July 15, 1991, defendant Dale Lynn Ryan, who was the manager of the fitness center and son of Ron Ryan, who, through corporate entities, owned the fitness center, was indicted for the crime of arson in violation of 18 U.S.C. § 844(i). Trial commenced September 3, 1991, and concluded with a guilty verdict on September 25, 1991. By special verdicts, the jury found that defendant's conduct of setting the fire resulted in the deaths of the two firefighters. On February 6, 1992, I sentenced defendant to imprisonment for a term of 328 months. Ryan appealed and his conviction was affirmed by a divided panel of the United States Court of Appeals for the Eighth Circuit. *See United States v. Ryan*, 9 F.3d 660 (8th Cir.1993). Rehearing *en banc* was granted and the panel opinion was vacated. The *en banc* court then affirmed the conviction, 6–5, and reinstated the panel opinion as to issues other than those considered *en banc* that had been raised in Ryan's initial appeal. *See United States v. Ryan*, 41 F.3d 361 (8th Cir.1994), *cert. denied*, 514 U.S. 1082, 115

S.Ct. 1793, 131 L.Ed.2d 721 (1995). The appeal presented many issues. The issue that divided the court was whether it was plain error for this court to give the jury instruction that it gave about the interstate commerce element of the crime.[1] The plain error standard of review applied because defendant's counsel had not objected to the instruction.

On October 30, 1996, defendant filed a motion for new trial, alleging three grounds: (1) newly discovered evidence that the government had suppressed favorable material evidence; (2) newly discovered scientific evidence, and (3) government use of perjured testimony. After a lengthy evidentiary hearing and exhaustive briefing, this court, on October 2, 1997, denied the motion for new trial. Defendant appealed and the court of appeals affirmed. *See United States v. Ryan*, 153 F.3d 708 (8th Cir.1998). The section 2255 motion is the latest challenge to the conviction.

## FACTS

The evidence adduced at the trial in 1991 is summarized in the circuit court panel's opinion, *Ryan*, 9 F.3d at 662–64, which I incorporate by reference herein. A copy of the panel's summary of facts is attached hereto as Appendix A. The following facts include those adduced at the section 2255 hearing.

T.K. Ford, Dale Ryan's original lawyer, contacted Keith Uhl, an experienced federal criminal defense attorney, when it became apparent that Dale Ryan was being investigated by federal authorities and was potentially subject to a federal indictment. Ford asked Uhl, on behalf of Dale Ryan, if Uhl would work with him on the case to assist in federal procedural matters. Uhl agreed. From the beginning of Uhl's representation, he knew that Dale Ryan's father, Ron Ryan, was paying for the entire defense.

Soon after joining the defense team, Uhl met with Dale Ryan in the lobby of a hotel in Kansas City to discuss the case. At this meeting, Uhl told Dale he was representing Dale and not his father, Ron Ryan, even

---

**1.** Section 844(i) provides in pertinent part: "Whoever maliciously damages * * * by means of fire * * * any building * * * used in interstate

*** commerce or in an activity affecting interstate *** commerce shall be [guilty of a crime]."* 18 U.S.C. § 844(i) (emphasis added).

though Ron was the one paying his fees; and that Uhl would "go CJA"—be paid by the court under the Criminal Justice Act—if Dale wanted to be independent from Ron or if Ron was involved in the arson. Indeed, Uhl asked if Dale wanted to cut a deal with the government and "take the old man under." Dale refused to cut such a deal and he repeatedly disclaimed any involvement by Ron in the fire. Moreover, Dale maintained his own innocence throughout Uhl's representation and continues to maintain his innocence to this day.

Uhl understood at the time of this meeting that there would be a federal arson charge with an interstate commerce element. Thereafter, Uhl considered what role the interstate commerce element would play in the case and prepared an on-going legal memorandum on the issue.

Uhl also met with federal prosecutor Linda Reade before the indictment was returned to learn what evidence the government had to support an indictment. For approximately two to three hours of work in this regard, Uhl charged Ron Ryan $7500, contingent on Uhl learning what evidence the government intended to use.

Also prior to indictment, the defense team held a trial strategy session in Chicago. Keith Uhl, Dale Ryan, Ron Ryan, Ron Ryan's wife Renee, T.K. Ford, Jack McInteer, a lawyer and friend of the Ryan family, and two or three experts attended the broad-ranging conference. During that meeting, the attendees considered the interstate commerce element of the potential federal arson charge. It was decided to not contest that element of the crime. The group deemed it detrimental to the defense to fight that issue for several reasons. First, the defense team decided against a shot-gun approach and decided to concentrate its efforts on one or two issues at trial. The main defense strategy was to argue that the fire was accidental, not arson. Any emphasis given at trial to the commerce element, a weaker issue, would detract from the main defense theory. Second, it was discussed that contesting the interstate commerce element could lead to

in-depth investigation by the government of Ron Ryan's business interests which might provide the government with evidence that would strengthen its motive theory. Apparently, Dale Ryan had operated other businesses owned by Ron Ryan which ultimately failed. Moreover, Ron Ryan's finances were allegedly weaker than was publicly known. The defense team was concerned that the prosecution might stumble upon these facts in searching for an interstate connection and thereby strengthen its motive theory—a theory that Dale Ryan desired to secure insurance money for his father to avoid causing his father another total business loss. Third, contesting the issue could lead to investigations into Dale Ryan's involvement in previous fires, and uncover that Dale Ryan had allegedly broken into Ron Ryan's home and stolen some items. Fourth, the defense team was intending to call Ron Ryan as a witness, and the team was concerned that if it raised the interstate commerce issue the government, on cross examination, would do a lot of damage to the "happy family" image and develop the aforementioned motive. Moreover, at this meeting, Ron Ryan expressed his fear of being indicted or somehow linked to the fire, explaining that being publicly identified as possibly being involved in starting the fire could detrimentally affect his business' financial situation. Fifth, Uhl thought the case law made the interstate commerce element an easy one for the government to prove in any event.

Dale Ryan was present at the Chicago meeting when the interstate commerce issue was discussed and he agreed that he wanted to avoid a defense strategy that would open up his father's financial situation because it could provide the government with a stronger motive theory. After the Chicago meeting, any attempt to open up Ron Ryan's business for inspection was closed out because it was believed to be contrary to Dale Ryan's best interests.

During Uhl's pre-indictment representation of Dale Ryan, he learned that Ron Ryan was considered by the government to be a suspect[2] in the arson and was also suspected

---

**2.** The record shows that Ron Ryan was a suspect only in the theoretic sense that whenever an insured building is destroyed by arson, the owner

is often looked at as a possible perpetrator. There is no other evidence in the record suggest-

of committing insurance fraud by claiming a computer as lost in the fire that had actually been removed from the building prior to the fire. This was later confirmed by Linda Reade, the federal prosecutor. At some point early in the process, McInteer and Uhl discussed whether Ron Ryan should get his own lawyer in Iowa. Uhl told McInteer that for the time being Uhl could look after the interests of both Ron and Dale Ryan. Ron Ryan was made aware that he may need his own lawyer if Dale and Ron's interests ever diverged. McInteer and Uhl agreed that if Ron Ryan hired his own lawyer in Iowa before any concrete charges were filed against him it may look like he "protesteth too much." Ron Ryan was never charged with any involvement in the fire and he never hired his own Iowa lawyer.

Uhl was concerned that during trial Ron Ryan, Renee Ryan, McInteer, and even Ford were doing things that served Ron's, rather than Dale's, best interest. Dale shared this concern. Although Uhl thought McInteer had a client relationship with both Dale and Ron during the trial, there is little, if any, evidence to suggest that McInteer was actually representing Dale. McInteer attended, but did not sit at counsel table or otherwise participate in, the first two weeks of trial, and McInteer attended, but did not participate in, some proceedings in chambers during those two weeks. Uhl told the court that he wanted McInteer present so that McInteer could help Uhl keep track of things. After the trial Dale made clear that he thought McInteer was doing Ron Ryan's bidding, that McInteer never represented Dale Ryan, and that McInteer should not be a part of the appellate team. There is no evidence that Dale expressed these sentiments prior to the guilty verdict.

Keith Uhl was the sole author of the trial brief submitted to the court. In that brief, Uhl failed to cite a case from the Eighth Circuit Court of Appeals of which he was aware and which was favorable to the de-

fense on the interstate commerce element— *United States v. Voss*, 787 F.2d 393 (8th Cir.1986). Rather, Uhl cited *United States v. Barton*, 647 F.2d 224, 231 (2d Cir.1981), and quoted the jury instruction discussed in that case.[3] At the 2255 hearing, petitioner emphasized that the court in *Barton* disapproved of the portion of the instruction given by the trial court which suggested that the interstate commerce element is satisfied if the building was insured by an interstate carrier. What the petitioner failed to point out, however, is that the court in *Barton* concluded that the interstate commerce element was satisfied because the fuel used to heat and light the building originated out-of-state. Uhl, citing cases from the Eighth Circuit, First Circuit, and Supreme Court, also stated that the "Eighth Circuit has broadly construed the commerce requirement."

At trial, I gave the following interstate commerce instruction:

### INSTRUCTION 10

"Interstate commerce" means trade, or business, or travel between the states. "Used in an activity affecting interstate commerce" means to affect in some way trade, or business, or travel between the states.

If you find from the evidence beyond a reasonable doubt that, on or about January 1, 1990, the Ryan Fun and Fitness Center building was owned by Ronald D. Ryan, a resident of Kansas, and leased by him to Ryan Air Services, Inc., a Kansas Corporation, then the required affect [sic] on interstate commerce has been proved; or if you find from the evidence beyond a reasonable doubt that on January 1, 1990, the Ryan Fun and Fitness Center building was supplied with natural gas used to heat the building, and such natural gas was supplied from outside of the state of Iowa, than the required affect [sic] on interstate

---

ing that Ron Ryan was involved in starting the fire.

**3.** The instruction used by the trial court in *Barton* read in pertinent part:
A building is used in, or in an activity [a]ffecting interstate commerce if food or drink mov-

ing in interstate commerce is sold there, or if oil or gas moving in interstate commerce is used to heat the building, or if the owner of the building is insured against loss or damage to the building by an insurance company that does business in more than one state.

commerce has been proved. If you do not so find, then the required affect [sic] on interstate commerce has not been proved and you must find the defendant not guilty.

This instruction was the instruction requested by the government with some editorial modifications (Obviously, I neglected to editorially change "affect" to "effect."). Defense counsel did not file a requested interstate commerce instruction. Pursuant to customary practice, I held an informal conference with counsel about the proposed instructions, the purpose of which was to learn of counsels' concerns and objections and make appropriate changes in the proposed instructions. In this way, this conference yielded the final form and content of the jury instructions. At this informal conference, Uhl expressly stated that the proposed interstate commerce instruction was satisfactory. It then became the final interstate commerce instruction. Uhl did not object to it when objections were later made on the record.

## DISCUSSION

### I. Petitioner's Ineffective Assistance of Counsel Claims

#### A. General Principles

The Sixth Amendment to the United States Constitution protects the fundamental right to a fair trial. The right to effective assistance of counsel "is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In determining whether a criminal defendant has received a fair trial, courts analyze ineffectiveness claims under the two-prong test set forth by the Supreme Court in *Strickland See. e.g., Neal v. Acevedo,* 114 F.3d 803, 806 (8th Cir.1997); *Powell v. Bowersox,* 112 F.3d 966, 968–69 (8th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 708, 139 L.Ed.2d 650 (1998); *Howard v. Cas-*

*pari,* 99 F.3d 895, 898 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1831, 137 L.Ed.2d 1037 (1997).

First, a petitioner must establish that his counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The standard applied under the performance inquiry is one of objective reasonableness in light of all the circumstances. *Id.* at 688–91, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052; *see Lockhart v. Fretwell,* 506 U.S. 364, 371–72, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). A petitioner must also overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052. Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052; *see Neal,* 114 F.3d at 806. Thus, "the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman,* 477 U.S. at 381, 106 S.Ct. 2574.

Second, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The prejudice determination is not based solely on outcome determination, but also on whether the result of the proceeding was fundamentally unfair or unreliable. *See Lockhart,* 506 U.S. at 368–70, 113 S.Ct. 838. "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id.* at 369–70, 113 S.Ct. 838. In making the prejudice determination, "a court hearing an ineffectiveness claim

must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

A court need not address both components of an ineffectiveness claim "if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. 2052.

In *Strickland,* the Court also noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. 2052. "The reasonableness of failing to investigate or act 'must be assessed in light of all [the] circumstances, and a significant degree of deference [must be] given to counsel and his or her professional judgment.'" *Sidebottom v. Delo,* 46 F.3d 744, 752 (8th Cir.1995).

### B. Failure to Object Claim

Petitioner argues that trial counsel's failure to object to the government's proposed instruction regarding the interstate commerce element of section 844(i) and the court's Instruction 10 fell well below the most basic standard of reasonably acceptable performance and that there is a reasonable probability, but for trial counsel's failure to object, that the outcome of the trial would have been different. I disagree with both contentions.

First, it should be noted that the Eighth Circuit Court of Appeals has not found Instruction 10 to be erroneous. On direct appeal, two judges on the three judge panel upheld the instruction under a searching review. *See United States v. Ryan,* 9 F.3d 660, 665–67 (8th Cir.1993), *vacated in part by* 41 F.3d 361 (8th Cir.1994). Moreover, a five judge plurality, in the *en banc* opinion, did not specifically find the instruction to be erroneous, but rather, merely concluded that if the instruction was erroneous, it was not clearly erroneous. Indeed, the plurality specifically noted that the controlling case law did not preclude either prong of the instruction and in fact may have supported such an instruction. As to the out-of-state ownership prong of the instruction, the plurality noted: "Although we have never held out-of-state ownership sufficient on its own terms to satisfy the elements of section 844(i), that status, coupled with the lease arrangement, is not a plainly inaccurate showing of sufficient

ties to interstate commerce." *See United States v. Ryan,* 41 F.3d 361, 366 (8th Cir. 1994). Concerning the natural gas prong, the court commented:

We have not ruled on whether receiving out-of-state natural gas by itself satisfies section 844(i)'s interstate commerce requirement. In *Hansen* [755 F.2d 629 (8th Cir.1985) ] we indicated that reliance on the use of electricity transported through interstate commerce to confer jurisdiction "would seem to stretch the notion of interstate commerce beyond the limits of logic." * * * *Hansen,* however, was decided before the *Russell* [471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) ] Court's recognition of the sweeping jurisdictional scope of the statute.

*Id.* at 367; *see also United States v. Melina,* 101 F.3d 567, 572 (8th Cir.1996) (relying, in part, on *en banc* decision in *Ryan* to uphold out-of-state gas instruction). In light of the state of the law at the time of petitioner's trial, as recognized by the court of appeals, I cannot conclude that trial counsel's failure to object to the instruction fell outside the wide range of professionally competent representation. *Compare* this case *with Fretwell v. Lockhart,* 946 F.2d 571 (8th Cir.1991) (finding ineffective assistance where attorney failed to object to aggravating circumstance instruction in sentencing phase of capital felony murder case that had been specifically held unconstitutional eight months earlier by controlling court and where jury relied exclusively on that circumstance to sentence defendant to death), *rev'd on other grounds by Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Pickens v. Lockhart,* 714 F.2d 1455, 1464, 1468–69 (8th Cir.1983) (finding ineffective assistance where attorney failed to object to jury instruction in sentencing phase of capital case that was admittedly a misstatement of the law); *Gray v. Lynn,* 6 F.3d 265, 268–69 (5th Cir.1993) (finding attorney's failure to object to obviously incorrect instruction on the intent element in an attempted murder case to fall outside the " 'wide range of professionally competent assistance.' ").

Second, trial counsel's approach to the interstate commerce element, and ultimately

his decision not to object to Instruction 10, were based upon reasonable trial strategy. Generally, where a decision by counsel can fairly be characterized as part of an overall trial strategy, counsel's judgment will rarely be second-guessed by a court on collateral review. *See, e.g., Huls v. Lockhart,* 958 F.2d 212, 214–15 (8th Cir.1992) (declining to second-guess attorney's strategic decision not to seek change of venue because of pre-trial publicity); *Haley v. Armontrout,* 924 F.2d 735, 740 (8th Cir.1991) (finding strategic choice not to present certain witnesses did not constitute ineffective assistance). Indeed, "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *See Neal,* 114 F.3d at 806 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

In this case, the defense team made a trial strategy decision early in the case not to contest the interstate commerce element. This strategy decision was based on a number of factors. First, the defense team decided to concentrate its efforts on contending that the fire was accidental and not caused by arson. They were afraid that any attempt to argue to the jury in the alternative that the commerce element was not satisfied would dilute the effectiveness of their accidental fire defense. Second, the defense team was concerned that any attempt to fight the commerce element would encourage the government to delve more deeply into the relationship between the fitness center, Dale Ryan, and his father, Ron Ryan. The defense team was worried that such an investigation could lead the government to evidence strengthening its motive theory for why Dale Ryan burned the fitness center—Dale's desire to avoid causing his father another total business loss at a time when his father could not afford such a loss. Third, after investi-

gating the law and the facts relevant to the interstate commerce element, Uhl decided that the government could, in any event, easily prove the interstate commerce element and that he should not risk running aground the aforementioned shoals by contesting it. Accordingly, Uhl and the rest of the trial team made the strategic decision not to contest the requirements of the interstate commerce element in their trial brief, before the jury, or by objecting to an instruction Uhl thought was consistent with the law of the circuit. I am unwilling to second-guess this strategic decision.[4] *Cf. Fretwell v. Norris,* 133 F.3d 621, 627–28 (8th Cir.1998), *cert denied,* 1998 WL 313322 (1998) (refusing to second-guess counsel's decision not to emphasize particular mitigating factor in sentencing phase of death penalty case where attorney did so out of fear of distracting jury from issues counsel believed were more likely to avoid the death penalty); *United States v. Acty,* 77 F.3d 1054, 1059–60 (8th Cir.1996) (finding no ineffective assistance where attorney relied on one defense strategy to exclusion of others).

Third, I conclude that there was not a reasonable probability of a different outcome had trial counsel objected to the commerce element jury instruction. An objection to the commerce element instruction by Uhl at the informal conference may well have resulted in the instruction being changed in some way.[5] If that had been done, however, there is still not a reasonable probability that the result of the proceeding would have been different. Rather, there was substantial evidence in the record upon which a jury would have based its finding of an interstate commerce nexus regardless of the exact language in Instruction 10. As the *en banc* plurality

---

**4.** Petitioner cites a number of cases for the proposition that the trial strategy doctrine is not applicable in some circumstances. In those cases cited by petitioner, however, the attorney either inadvertently failed to investigate the issue or otherwise neglected to consider an obvious legal position with no discernible downside. *See, e.g., Starr v. Lockhart,* 23 F.3d 1280, 1286 (8th Cir. 1994) (finding ineffective assistance where attorney failed to investigate the constitutionality of aggravating circumstances in death penalty case); *Driscoll v. Delo,* 71 F.3d 701, 710 (8th cir.1995) (noting that attorney admitted that fail-

ure to impeach eyewitness was not due to any trial strategy). Those cases cited by petitioner are distinguishable from the case at hand in that the record in this case supports the trial counsel's contention that he thoroughly investigated the law and facts regarding the interstate commerce element and made a strategic decision not to make the element a contested trial issue.

**5.** I say "in some way" advisedly. Neither Dale Ryan's present counsel nor any of the court of appeals' opinions in this case suggests what the content of Instruction 10 should have been.

opinion noted in affirming Ryan's conviction on direct appeal:

> We find pervasive evidence in the record that the Fitness Canter maintained a sufficient post-closing nexus with interstate commerce to bring it within the reach of the statute. The property was commercial in nature, and the totality of circumstances indicates that it was embraced by the recognized meaning and intent of section 844(i) despite a cessation of its operation as the Fitness Center.
>
> \* \* \* \* \* \*
>
> Suffice it to say that all of the circumstances of this case, when viewed in the light of the Court's holding in *Russell* and of our prior decisions regarding temporarily closed commercial property, lead to the conclusion that the Fitness Center was covered by the broad reach of section 844(i).
>
> \* \* \* \* \* \*
>
> It is clear that an instruction could have been formulated and presented under these facts sufficient to allow a proper jury finding of the requisite interstate nexus. \* \* \* [6]

*Ryan*, 41 F.3d at 365–66 (Wollman, J.); *see also id.*, at 368 (Morris Sheppard Arnold, J., concurring in the judgment) ("I concur in the judgment in this case because I do not believe that the district court's error, if any, was plain, since the defendant has not demonstrated that it 'affected the outcome of the District Court proceedings.' "). Moreover, the five judges who dissented on direct appeal merely stated that the jury *could* have reached a different conclusion, not that such a different conclusion was a reasonable probability. *See Ryan*, 41 F.3d at 370 (Richard S. Arnold, C.J., dissenting in part). Accordingly, petitioner has failed to show sufficient prejudice stemming from trial counsel's failure to object to Instruction 10.

For the foregoing reasons, petitioner's motion to vacate or set aside his sentence on this ground will be denied.

### C. Conflict of Interest Claim

In a related claim, petitioner contends that he should receive section 2255 relief because an actual conflict of interest adversely affected his attorneys' performance. Specifically, petitioner claims Uhl and the defense team decided not to mount any challenge to the commerce element because such a tactic may have been contrary to the interests of Dale's father, Ron Ryan, who was paying the attorneys' legal fees. Petitioner correctly contends such an actual conflict of interest is appropriately analyzed under the standards articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

A corollary to the Sixth Amendment right to effective assistance of counsel is the right to representation that is free from conflicts of interest or divided loyalties. *See Acty*, 77 F.3d at 1056. The Supreme Court specifically recognized this constitutional right in *Cuyler v. Sullivan* when it held that a defendant could establish a Sixth Amendment violation by demonstrating "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708. Indeed, the Court concluded that an attorney acting under an actual conflict of interest is so contrary to the constitutional right to effective representation that it can never be harmless error. *See id.* at 349, 100 S.Ct. 1708. "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. 1708; *see also Strickland*, 466 U.S. at 692, 104 S.Ct. 2052 ("In *Cuyler* \* \* \*, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.").

To establish a violation of the Sixth Amendment under *Cuyler*, petitioner must establish two elements. First, the petitioner must establish that his attorney acted under an actual conflict of interest, not merely a potential one. *See Cuyler*, 446 U.S. at 348–50, 100 S.Ct. 1708; *see also Dawan v. Lockhart*, 31 F.3d 718, 721 (8th Cir.1994) ("The threshold fact *Cuyler* requires a defendant to establish, in order to prevail on a claim of ineffective assistance of counsel due to conflict of interest, is an *actual* conflict of interest, not merely a potential one."). Second,

**6.** *See* footnote 5.

the petitioner must establish that the conflict of interest actually affected the adequacy of the representation. *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 ("Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'"); *Dawan,* 31 F.3d at 721–22. Assuming without deciding that petitioner's trial team acted under an actual conflict of interest by accepting payment from petitioner's father, I must decide Whether there is any evidence in the record establishing that this conflict actually affected the adequacy of their representation. *Cf. Wood v. Georgia,* 450 U.S. 261, 268, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (finding sufficient possibility of conflict of interest to remand for fact finding on issue of actual conflict of interest where employer hired attorney to defend employees); *Quintero v. United States,* 33 F.3d 1133, 1135 (9th Cir. 1994) (remanding for hearing on *Cuyler* issue where a defendant in a drug case was represented by an attorney paid for by an anonymous third party and the attorney suggested that the defendant not accept the plea offer from the government); *but see United States v. Shaughnessy,* 782 F.2d 118, 120 (8th Cir.1986) (recognizing inherent dangers of third-party-payer arrangement, but finding defendant failed to prove that those dangers ripened into an actual conflict of interest).

 To establish that the conflict adversely affected petitioner's representation, he must demonstrate (a) that some plausible alternative defense strategy or tactic might have been pursued, and (b) that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *See United States v. Fahey,* 769 F.2d 829, 836 (1st Cir.1985); *see also Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993) (adopting test articulated in *Fahey* ). To satisfy the first requirement petitioner need not show that the defense would necessarily have been successful if it had been used, but only "that it possessed sufficient substance to be a viable alternative." *See Fahey,* 769 F.2d at 836; *see also Winkler,* 7 F.3d at 309. In this case, there was a plausible alternative defense—a challenge to the interstate commerce element and an objection to Instruction 10. Petitioner has not, however, established that his attorneys declined to raise this defense because it was not in Ron Ryan's interest to assert it. Rather, Uhl provided at least two primary strategic reasons for not challenging the interstate commerce element which were governed solely by the interests of Dale Ryan. *See supra* pp. 1047, 1048, 1051. Such representations by defense counsel warrant substantial weight. *See United States v. Flynn,* 87 F.3d 996, 1001 (8th Cir.1996) (citing *United States v. Agosto,* 675 F.2d 965, 972 (8th Cir. 1982)) ("In determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations."); *Acty,* 77 F.3d at 1057 (crediting attorneys' testimony that there was no conflict of interests between two defendants). In essence, petitioner has failed to show that his trial team would have performed differently regarding the commerce element instruction had they avoided the alleged conflict of interest.[7] *See Acty,* 77 F.3d at 1058 (applying second prong of *Cuyler* as a "but for" test); *see also Winkler,* 7 F.3d at 309–10 (finding actual conflict of interest and plausible alternative strategies but concluding that attorney did not forgo those strategies because of his conflict). Accordingly, petitioner has not satisfied the *Cuyler* elements and his motion to vacate or set aside his sentence on this ground will be denied. *See Fahey,* 769 F.2d at 836 (finding no constitutional violation because decision not to call ex-partner as a witness was a

---

**7.** Petitioner suggests in his post-hearing brief filed on February 20, 1998, that Uhl admitted that other members of the defense team were constrained from mounting a "whodunit" defense because Ron Ryan, the payer, was the most logical alternate suspect. I do not read the record to contain such an admission, nor do I find sufficient evidence in the record of a "whodunit" defense for it to be a viable alternative. Rather, petitioner merely raises a "whodunit" defense as a theoretical, unsubstantiated, alternative concept. Such post hoc theorizing is insufficient to prove an adverse effect on the trial team's representation. *See United States v. Shaughnessy,* 782 F.2d 118, 120 (8th Cir.1986) (finding no adverse effect caused by conflict where alternative course of action was merely hypothetical). Moreover, I do not find a causal link between the alleged conflict and any other strategic decision made by the defense team.

result of strategic move independent of alleged dual loyalties and calling ex-partner would not have benefitted defendant but rather been contrary to his best interests).

### D. Failure to Investigate Exculpatory Evidence Claim

Petitioner's failure to investigate argument is independent of the interstate commerce issue. Petitioner claims that trial counsel was ineffective in failing to investigate and utilize the exculpatory nature of some crime scene evidence and pretrial testimony, and in failing to discover and utilize computer modeling technology. I find these arguments to be without merit.

### II. *Petitioner's Lopez Argument*

In *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court held that, under the Commerce Clause, Congress is empowered to regulate only those activities that " 'substantially affect[ ]' interstate commerce." *Id.* at 559. Petitioner argues that the record is devoid of evidence that the closed fitness center substantially affected interstate commerce at the time of the fire, and that Ryan is therefore entitled to have his sentence vacated or set aside. Even if there is sufficient evidence in the record to satisfy the *Lopez* standard, petitioner argues, relief is still appropriate because in Instruction 10 the court referred the jury only to evidence that was insufficient to satisfy *Lopez.*

The Eighth Circuit Court of Appeals has rejected a facial challenge to section 844(i) brought under *Lopez, see United States v. McMasters,* 90 F.3d 1394, 1398 (8th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 783, 136 L.Ed.2d 726 (1997), and petitioner does not challenge that decision. Rather, petitioner contends that *Lopez* changes the standard by which Instruction 10 is measured and that Instruction 10 fails to satisfy the modified standard. Specifically, petitioner argues that Instruction 10 was inadequate because it failed to require the jury to find a "substantial," rather than a de minimis, interstate commerce nexus. Assuming without deciding that petitioner could show sufficient cause and actual prejudice to raise this issue for the first time in a 2255 motion, *see United States v. Frady* 456 U.S. 152, 167–68, 102

S.Ct. 1584, 71 L.Ed.2d 816 (1982), I conclude that petitioner's argument must fail on the merits.

The Eighth Circuit Court of Appeals has previously ruled that *Lopez* "did not address the amount of evidence required to prove an explicit jurisdictional element" and therefore is inapplicable to a claim that the government failed to prove sufficient interstate nexus in a federal arson case. *See United States v. Flaherty,* 76 F.3d 967, 974 (8th Cir.1996) (refusing to conclude that *Lopez* requires a finding that receipt of out-of-state gas by a commercial property is inadequate to satisfy section 844(i)'s interstate commerce element); *see also Melina,* 101 F.3d at 573 (same). In *Melina,* the court of appeals explained that the statute assailed in *Lopez* did not contain an explicit jurisdictional requirement, and that the *Lopez* Court did not, therefore, have the opportunity to discuss the quantity of evidence necessary to satisfy such an explicit jurisdictional element. *See Melina,* 101 F.3d at 573 (citing *Flaherty,* 76 F.3d at 974). By its very terms, the court reasoned, *Lopez* is inapposite to a claim that the government failed to establish a sufficient connection with interstate commerce to satisfy section 844(i)'s interstate commerce element. *See id.*

In *United States v. Hicks,* Chief Judge Posner explained in more detail why *Lopez* does not require the word "substantial" to be read into section 844(i)'s interstate commerce element. 106 F.3d 187 (7th Cir.1997), *cert. denied* —— U.S. ——, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997); *see also United States v. Wing,* 104 F.3d 986, 992 (7th Cir.1997) (reaffirming, after *Lopez,* that § 844(i) requires only a de minimis connection to interstate commerce). As Judge Posner explained, *Lopez* requires "that the *activity* regulated by federal law affect interstate [commerce] substantially, but not that every *transaction* affect commerce substantially." *Id.* at 188–89, 115 S.Ct. 1624; *see also Lopez,* 514 U.S. at 558, 115 S.Ct. 1624 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)) (" 'The Court has said only that *where a general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individu-

al instances arising under that statute is of no consequence.' "). The *activity* regulated by the arson statute is the intentional burning of property used in or affecting commerce. *See Hicks,* 106 F.3d at 189. There is little doubt that such activity has a substantial effect on interstate commerce. *See id.;* *McMasters,* 90 F.3d at 1398 (upholding section 844(i) against facial challenge after *Lopez* ). The *transaction* in this case is the intentional burning of the fitness center. *See Hicks,* 106 F.3d at 189–90. Each transaction, or each arson, need only have a slight effect on interstate commerce because the aggregate effect of each such arson results in a substantial effect on commerce. *See id.* The trial court in *Hicks* instructed the jury that " 'the government need only establish a minimal connection between the property at issue and some aspect of interstate commerce.' " *Id.* at 190. As Judge Posner correctly pointed out, neither the statute nor *Lopez* requires more. *See id.; see also Lopez,* 514 U.S. at 567, 115 S.Ct. 1624 (noting that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."). Because *Lopez* does not require Instruction 10 to articulate a substantial interstate commerce nexus, and because the court of appeals has already upheld Instruction 10 under the pre-*Lopez* de minimis standard, petitioner's *Lopez* argument must fail.

■ Even if petitioner may use *Lopez* to mount an "as applied" challenge to Instruction 10, I conclude that the effect of *Lopez,* if any, on this case is not sufficient to make either prong of Instruction 10 erroneous as a matter of law. It is well settled that Congress intended, in enacting section 844(i), to exercise its full power under the Commerce Clause to protect virtually all business property from arson. *See Russell v. United States,* 471 U.S. 858, 859–60 & nn. 4–5, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985); *Ryan,* 41 F.3d at 364; *United States v. Voss,* 787 F.2d 393, 397 (8th Cir.1986). Prior to the Court's decision in *Lopez,* most courts believed Congress, under the Commerce Clause, could regulate any criminal activity bearing even a de minimis relation to interstate commerce. *See, e.g., Voss,* 787 F.2d at 397. After *Lopez,* however, Congress' reach under the Commerce Clause is limited to those activities having a substantial effect on interstate commerce. It is unclear how much more of a connection to interstate commerce, if any, must be shown under a substantial rather than a de minimis standard. *See Russell,* 471 U.S. at 859–60 n. 4, 105 S.Ct. 2455 (suggesting in a pre-*Lopez* opinion that, under the Commerce Clause, Congress could only reach criminal activity " 'substantially affecting interstate commerce.' "). It is clear, however, that the direct interstate connection required by Instruction 10 is much more substantial than the indirect interstate connection articulated by the government and disapproved of by the Court in *Lopez.* In *Lopez,* the connections articulated by the government between the possession of a firearm in a local school zone and interstate commerce were, to say the least, attenuated. *See Lopez,* 514 U.S. at 567, 115 S.Ct. 1624 (recognizing that to uphold the government contentions would require the Court to pile inference upon inference); *see also Hicks,* 106 F.3d at 189 (describing these connections as "elongated and speculative"). First, the government argued that the possession of a firearm in a school zone may result in violent crime which in turn could result in substantial costs levied on society through the mechanism of insurance. *See Lopez,* 514 U.S. at 563–64, 115 S.Ct. 1624. Second, the government contended that the violent crime resulting from guns in school zones could reduce the willingness of individuals to travel to those areas where violent crime occurs. *See id.* Third, the government argued that the presence of guns at or around schools detrimentally affects the learning environment, resulting in a less productive citizenry, which in turn adversely affects the Nation's economic well-being. *See id.* at 564, 115 S.Ct. 1624. By contrast, Instruction 10 required the government to prove either that the fitness center was owned by a foreign party and leased to another foreign party or that the fitness center used gas supplied from out of state in its operations. Suffice it to say that both of these prongs required proof of a direct, rather than an indirect, effect on interstate commerce. *See Russell,* 471 U.S. at 862, 105 S.Ct. 2455 (holding that the rental of real estate is "unquestionably" an activity affecting commerce); *Hicks,* 106 F.3d at 189 (noting that the supplying of gas to private

homes is a major interstate activity and its potential disruption by arson a legitimate matter of federal concern). Such a direct effect is, I believe, substantial. Accordingly, petitioner's motion to vacate and set aside his sentence on this ground will be denied.

### III. Conclusion

The Constitution requires that petitioner receive a fair trial. Petitioner has failed to establish any of his asserted grounds for section 2255 relief or that the trial was in any way unfair or the result unreliable. Petitioner's collateral attack on his conviction must, therefore, fail.

### RULING AND ORDER

Defendant Dale Lynn Ryan's motion to vacate or set aside his sentence is **DENIED.** **IT IS ORDERED** that Ryan's 2255 motion be dismissed.

### APPENDIX A

On January 1, 1990, a fire destroyed the Ryan Fun and Fitness Center ("the Center") in West Burlington, Iowa. The Center, recently closed due to financial difficulties, was managed by appellant Dale Ryan, and owned by Ryan's father, a successful Kansas businessman. (Ryan's father had previously backed Ryan in two failed business ventures.) Ryan assumed management of the center in January of 1989 and immediately began a major remodeling effort. The ensuing year was fraught with difficulties, financial and familial, and Ryan soon lost his enthusiasm for the Center, while his relationship with his father became increasingly strained. Ryan stated on several occasions that he wished the Center would burn down. Ryan also expressed concern on several occasions that his father did not hold him in high regard because of his failures.

On December 6, 1989, Ryan's father directed that the Center be closed. Ryan had the locks changed, retaining the only two keys in his possession. (He did not replace the key in the exterior box, to be accessed by the fire department in an emergency.) Ryan then began efforts to sell the Center. On December 16, Ryan took a complete photographic record of the Center. On December 26, he removed his personal property, and some property belonging to the Center, ostensibly in an effort to ready the Center for sale. (Ryan later made a false claim for insurance coverage on the property belonging to the Center, claiming that it was lost in the fire.) On December 20, Ryan requested that U.S. West disconnect the Center's dedicated fire alarm line, as well as the regular phone line. Ryan believed that the lines would be disconnected immediately. In fact, the regular phone line was disconnected on December 21 and the dedicated line disconnected on December 28. Between December 20 and December 28, five trouble signals from the center (caused by interruption in the electrical current or the dedicated phone line) were received at the West Burlington law enforcement center. In each instance, the alarm was reset at the center's fire alarm panel, generally within a few minutes. On December 29, Ryan called U.S. West to verify the disconnection of the dedicated line.

On December 29, at approximately 2:00 a.m., West Burlington police officer Larry Garmoe made a routine check of the Center. In the parking lot, he noticed a car loaded with containers, including floor solvents, motor oil, and linseed oil. Officer Garmoe could not identify the labels of several additional containers located in the back seat. Ryan received a ticket in November, 1989 while driving a car with the same license number. Officer Garmoe testified that he saw Ryan driving a car with the same license number on January 10, 1990. (While the license number was never in dispute, Officer Garmoe did note on the night of December 29, that the car which he observed was a blue Ford Fairmont. In fact, the car was a white Mercury Zephyr, owned by Ryan's father.)

On December 30 and 31, Ryan was distraught and depressed, apparently over a disagreement with his girlfriend. In late December, 1989, Ryan made serious inquiries about the purchase of a bar in Gulf Port, Illinois, indicating that money was no problem. On January 2, 1990, Ryan again spoke with the owner of the bar about the purchase, but failed to mention the fire at the Center.

The fire at the Center was discovered at approximately 8:30 p.m. on January 1, 1990. Firefighters later testified that, upon their arrival at the Center, all doors were locked and there were no signs of forcible entry.

Firefighters further testified that they observed unusual fire behavior during the firefighting and rescue effort, similar, in their experience, to other fires which had been fueled by flammable liquids. Two distinct and separate red hot areas, approximately 50 feet apart, glowed on the roof; low bluish-colored flames which rekindled quickly when blackened with water danced on the floor; an intense wall of fire which did not respond to water swept across the lounge area; an isolated, interior fire confined to the sauna rekindled quickly when doused with substantial quantities of water; an unusual fire in the wall of the weight room also rekindled after being blackened with water. Firefighters Wilt and Klein were the first firefighters to enter the Center and were discovered missing ten to fifteen minutes later. Apparently having left their hoses in panic, in response to the wall of fire in the lounge, the bodies of the two men were discovered approximately three hours later in the DJ booth of the lounge area.

Ryan arrived at the fire scene shortly after the fire started. Firefighters later testified that Ryan, initially in a quiet mood, began making inquiries about the origin of the fire, and stated that he hoped they did not think it was arson. Ryan became very agitated when he learned that two firefighters were missing. Approximately four to five days later, Ryan wrote to his girlfriend, stating that he did not start any "fires" at the Center. On January 2, 1990, Ryan hired an attorney.

Investigations by the Iowa Fire Marshal's office and an electrical engineer ensued. It was revealed that Ryan had the only key at the time of the fire (the other having been lost in the snow), the circuit breaker for the fire alarm panel had been turned off, and the battery backup to the alarm had been disconnected before the fire. The fire marshal examined the debris and the number, location, and type of burn patterns, and concluded that the fire was caused by arson. The fire marshal also concluded that flammable liquids had been used and that there were at least six separate areas of fire origin. An electrical engineer also examined the fire scene and ruled out electrical cause and origin. Laboratory tests for flammable liquids, conducted on 26 samples taken from the fire scene, were negative. However, two experts

testified that, depending upon the characteristics of the flammable liquids used, the amount of water applied, and the duration of the fire, flammable liquids can be diluted, can evaporate, or can be totally consumed by fire. Thus, the presence of flammable liquids is not always detectable, and the negative test results not always conclusive.

Ryan testified at trial, and called five expert witnesses in his behalf. Ryan's theory of defense was that arcing wires in a cash register, which he accidentally knocked off of the counter, caused the fire, which then spread to the other areas of the Center. Ryan contended that the multiple burn patterns were caused by pieces of flammable materials falling from the ceiling and that the fire spread through the roof. Ryan also offered evidence that the phenomena of flashover and backdraft caused the unusual fire behavior witnessed by the firefighters.

On rebuttal, the government's experts attacked Ryan's theory involving the design of the cash register. The experts also testified that Ryan's theory of the fire's spread was inconsistent with known fire behavior.